Pochop? Did I say that right? Pochop. Good morning, and may it please the court and counsel, Mr. Cody's case, and he's here today in the courtroom, is an important one because it gives this court an opportunity to further explain and illuminate the McDonnell Douglas pretext in direct proof analysis in employment discrimination cases. And it's a unique case because I've been unable to find any other case in our circuit where the plaintiff's performance is evaluated by the given to the decision makers with regard to what they should do with regard to improving this employee's performance, and the decision makers disregarded the HR office's directives. We are not here asking the court to sit as a super HR department or impose its own judgment on what performance standards should be at POET. So, if I get it, you're saying the Human Resources Department looked over the record and said to the decision makers, keep him on for a while, is that about right? That's exactly right. In fact, they documented that. Keep him on for a while, see if he works it out. Are you talking about the second PIP? Yes, I am. So, one of the clarifications that the evidence shows was, came to the decision makers after they'd made their decision. Exactly. And therefore, I don't understand why it's either unique or very relevant if that's undisputed. That is undisputed. It's admitted that the performance that was considered in the termination all occurred before that PIP. It's undisputed that it was presented and that the decision makers here requested that the HR department approve their request to terminate this employee. And it's also undisputed that they have to ask for permission. That is part of their policy. When the HR department makes a decision about it, the decision makers are obligated to comply with it, and they did not. I thought they got all the approvals that were required. When they asked if they could terminate Mr. Cody, the HR department at POET said, no, you must put him on a PIP. And in fact, I think that document is probably one of the most important pieces of evidence with regard to this pretext claim because it establishes two important things that show that it is contrived and false. First, the timing of it establishes that none of the performance, all of the performance that was complained of as part of the termination occurred before it was issued. They said it was issued because Mr. Cody had failed to meet his employee evaluation in November of 2008, and this thing wasn't issued until January of 2009 for an unknown reason. But more importantly, and I think it is consistent with decisions that this court has made before, it was impossible for Mr. Cody to meet the very personalized standards that were established for him in the PIP. This was not a form letter. This specifically addresses Mr. Cody's performance. And in fact, in the PIP, POET itself documents, these are areas of improvement Bryce is capable of, and we are willing to provide him with the necessary training if asked. That is completely contrary- Notes of your brief say that, say your brief says that Fredrickson, with HR approval, terminated Mr. Cody on January 21, after the PIP said, wait, you've got to do these things until March 9. And now you're saying that they did this over HR's disapproval. I can't square that. The testimony of the decision-maker, that Mr. Fredrickson was one of the decision-makers who decided shortly after December of 2008 that they were going to terminate Mr. Cody. He was the general manager. And so they go and they present it to the HR department, which they are required to do. And then they issue on July, I'm sorry, December 29, 2008, HR says, you have to do this performance evaluation. You have to coach, under their policies, you have to coach for him, and you have to try to help him. And they actually set up deadlines for completion, and they required the decision-maker to go and meet with him and evaluate his performance. He was never- Did HR approve the January 21 decision? HR is definitely involved in it because- Then this is just, you know, what they thought in December. I mean, that doesn't mean that they don't have to, that's not, you haven't proved any pretext that HR thought by January 21 that enough had been done. But they, Your Honor, they know that absolutely nothing had been done, because they weren't actually ever going to follow through. Because it's a contrivance. It is a contrivance to require an employee to commit to following a PMP, and not only the employee, but the decision-maker was also required to do it. And they admit it became a lie, because they never, they weren't going to do it, they never intended to do it. It was impossible for Mr. for them to measure them, because by their own documentation, they never did actually go and measure his employment. If all that's true, or can fairly be inferred, I have grave problems finding any relationship between these events and the neck injury to provide the causation linkage that you have to establish. I think that there is, I think there's relatively substantial evidence that there was an animus about Mr. Cody's disabling condition. First of all, I think it comes from the comments of his decision-makers that initially, there's absolutely no dispute that they accommodated Mr. Cody's injuries, they assigned him to light duty, and, but it's also, it is a disputed issue between the parties. Mr. Cody said that beginning in August of 2008, he began to be subject to almost daily comments from a decision-maker that said, when are you going to get off, when are you going to be done with light duty? We've got to get you off light duty. That is not, while the ADA does allow employers to inquire what an employee can do within their limitation, there is a distinct difference with saying, what can you do within your limitations, versus, you must do more, and when are you going to start doing more? That's a very different thing, and it is over the line. And that is a decision-maker, those were not stray remarks, it was a decision-maker who weighed in on his personnel evaluation and a couple months later, even though she disputes that she did that. Are you aware of, I'm not aware of an ADA case that involves a workers' comp rehab situation, are you? Your Honor, I don't think that the origin of the disabling injury is relevant. But employers have a tremendous interest in expediting the costly workers' comp rehab process, and if that's, and my understanding is that's what Mr. Cody was going through, and in which case the employer and his supervisors will have every interest and concern to end that process as fast as it could reasonably be ended, and it seems to me that that cuts across or against the inferences, the ADA inferences you want us to draw. You know, Your Honor, they have . . . Is there a case law that talks about this kind of situation? No, there isn't, because the question in these cases is whether the employee is disabled within the meaning of the ADA, and that is not a disputed fact here. How it happened, whether it happened outside of work or, as here, inside of work, I agree with you, employers get very highly interested in work comp claims, and that is, it became very obvious that they lost patience because of the fact that Mr. Cody could not improve his physical condition. He did everything he could to try to keep his job, Your Honor. He went to his doctor, he adjusted his medication. Even when he was in pain, he would go ask to have his duty reassessed. This was a decision made by his physician, and they were aware of it, and in fact, there's a temporal proximity to the decision that they, when they decided that they were going to terminate him, no matter what his performance was thereafter, that was at the end of December 2008. On December 12th and December 8th of 2008, Mr. Cody's doctor informed both their work comp carrier and POET, the decision makers became aware of the fact that Mr. Cody was not going to be removed from light duty service. His disability required him to maintain on that. POET's decision makers themselves said, we don't, we don't think we can do that. Just because, excuse me, Your Honor. That's kind of an unusual situation. Was there anything in the record that said the people who are in charge of firing, as in this case, have to abide by their recommendation of the human resources department, or can they just go ahead with what their views are, regardless of what the human resources department recommends? They cannot, Your Honor, they are by their policy and it is, it was not disputed on the record that the decision makers here are obligated, the HR department, their corporate HR department makes the decisions in this case. Actually one of the decision makers, Mr. Fredrickson, is considered part of their corporate office because of his position as the general manager. And the reason I say to address your issue before Judge Volk, and the reason I say that he was a part of that process, but another reason that you can tell that this is a contrivance is because at the same time that they issue this, they have him commit to it, they sit down and sign it, and the decision makers themselves sign on, like they're going to do this, and then they admit they never do it. They're also floating around, and it's another exhibit, they're floating around a timeline that they do edit. They do go of incident. The H&R recommendation was also signed by the decision makers? Yes. The PMP is signed by the decision, by Mr. Schauer. He's, in fact, he commits to the meetings. Not the general manager, but the, but in conjunction with the general manager. But if you look. Is that an approval? Yes. And it's his agreement that he's going to abide by that PMP, which he never intended to and did not do, and that's why he said it became a lie. But I also think, Your Honor, it's important to look at the timeline that's attached to the termination letter. If you notice that according to their own timeline, which they did go edit, they circulated this thing out, and they took out references to his surgery, and the date that he was assigned to light duty. That was circulated with HR. So that's how we know HR is involved in this somehow. There are emails back and forth saying, here's an incident timeline. And one does have to wonder, why would Mr. Cody's assignment to light duty, why would his work comp status be, and his surgery, why would that be in his incidents about his performance? But if you look at the timeline, it establishes that there was no disciplinary action before his injury, which occurred in June of 2007, and there was no disciplinary action and no failures of performance after the PMP was issued in January of 2008. And I think that timing is important. I think it helps establish the contrivance and the falseness. Because they were circulating, Mr. Fredrickson was circulating around, at the same time they have this PMP, and they're supposed to be having these meetings, they're already circulating a document that says, January XX, 2009, termination letter for failure to perform. That's how you know it's not true. I would like to preserve just a little time, so, thank you. Mr. Pimm. Thank you, your honors. May it please the court, counsel. I'm here today on behalf of Prairie Ethanol LLC, also known as POET Biorefining Mitchell. POET is an ethanol refinery, and it makes ethanol, or produces ethanol, for use in vehicles. I will, in a moment, address counsel's claims that the PMP, or second PIP, was a contrivance, and her claims that Ms. Pitts, the supervisor who, according to the record, asked the appellant about his restrictions, are relevant. But before I jump into that, I would like to address something that has been lost a bit in the narrowing of the issues here. The issues have been narrowed at this point to whether POET's legitimate non-discriminatory reason for terminating the grievant, excuse me, the appellant, was pretext for invidious disability discrimination. What's been lost in that is POET's bedrock reason for terminating the appellant. What's been lost is the legitimate non-discriminatory reason for terminating him. That is important because this court has said repeatedly that the burden of proof on pretext is more difficult because it must be viewed in light of the employer's justification. And in this case, that justification is strong. I am going to jump to set forth the justification to November 1, 2008, which is eight days after the appellant completed a performance improvement plan that he was on as a result in part of performance issues, and in particular, the manner in which he operated the plan. What year was that? 2008. That's just before the year he was terminated. Correct. He was on the first performance improvement plan from September through October of 2008. Eight days after the first performance improvement plan expires, he almost loses the plant. Now, again, this is an ethanol refinery, and losing the plant is not an insignificant occurrence. It is very rare, of course. It also doesn't have much to do with whether he wasn't nice enough to his coworkers. Has nothing to do with whether he was nice enough to his coworkers. Which is the stated non-discriminatory reason. No. No, no, no. His candor, or excuse me, his demeanor toward his coworkers had nothing to do with his termination. He was terminated, your honor, for the manner of operation of the plant. On November 1, he almost lost the plant, and in his own words, he really screwed up. Don't know how he managed to not lose the plant. I haven't read the record. Where in the record can I get that confirmed? Because the briefs left me with the impression his demeanor issue was very significant to the termination. To the contrary, your honor, and I will give you record sites in a moment, but his demeanor had nothing to do with his discharge. In fact, it was, the record sites are Joint Appendix 43, 44, 51, 52, and 288, 89. All of which talk about the reasons for the discharge. In fact, your honor, the discharge, according to the file itself, the reason for discharge, as stated on January 21, 2009, when he was discharged, was because of his history of concerns and lack of sustained improvement, in addition to the most recent operational incident dated December 25. That incident on December 25 was of the same nature as the incident of November 1. On December 25, appellant once again operated the plant, as his supervisor said, with one foot on the gas and one foot on the pedal, one foot on the brake and one foot on the pedal, and in an inappropriate manner. A manner which he had been coached about improving since before he injured himself in 2007. In fact, his very first performance review at the company said, you need to slow down, and I'm paraphrasing. You need to not make so many adjustments to the plant. Between that first performance appraisal and the September 2008 PIP, he was coached four more times about the manner in which he was operating the plant. He then went through the PIP, eight days after the PIP had expired, he almost lost the plant. Two weeks later, on November 16, he's coached again. You need to slow down. You can't operate in this fashion. You can't cause swings. Swings cause us to lose the plant. Losing an ethanol refinery is a very significant issue. It not only has safety implications, but it has huge production implications for the 42 employees who work at an ethanol refinery. Then, despite that pattern, once again, on December 25, he, in his own words, screwed up. This is his own log entry. Sorry man, I'll save you the trouble of trending the dryers. All I did was take one point off recycle on A, and I had to pay for it all night while we got a new firm. Next time, if they're running good, I won't touch them. It was exactly what he had been doing and had been coached about for two years, and once again, he did it. The record evidence is crystal clear, Your Honor, and I direct your attentions in this regard, and in particular, two pages, 290 to 293 of the joint appendix, and in particular, 138 to 153 of Shower's deposition. That information, in front of the people in HR, Human Resources, when the request was to fire this person and Human Resources said, put him on a PMP. The timing of that has been confused, Your Honor. They did not say, you have this information instead of firing him, put him on a PMP. For the first time in their reply brief, they suggest that, but you'll note where they suggest that on pages 3, 6, and 7, there are no citations to the record. What happened, Your Honor, is this. The incident of December 25th occurred. As a result of that incident, the first-line manager, Rick Shower, made the decision, this can't go on. He is putting us at risk. He continues to operate this plant with one foot on the brake and one foot on the pedal. He then went to his immediate supervisors, including Becky Pitts and Dean Fredrickson, and said, we need to let this guy go. Fredrickson agreed, and they all also agreed, we're not allowed to let anyone go without corporate approval. That corporate approval was given on January 21st, and that is the day he was fired. At the same time, on a separate track, he was placed on a PMP, or the second PIP, because on an earlier performance review, he scored a 1.9. And per POET policy, all individuals who score below a 2 are required to be placed on a PIP. So, and you'll see the testimony when you review these pages of the record, what Mr. Shower said is, we went forward with the PIP because we had to. The PIP turned out to be a lie because we knew we weren't, we knew the termination request was in the process. We would have gone forward with the PIP if that termination request was rejected, but the termination request wasn't rejected by Sioux Falls. The PMP, as issued, was not issued with knowledge of the December problem. That is correct. The PMP was issued as a direct result, and the deposition testimony says this, as a direct result of what happened of his 1.9 in his review, which was given to him in November. Once he got that review in November, it was clear they had to go forward with a PIP. In the November report, wasn't that also one of the times where he had screwed up and almost had the plant go out? The performance review, the 1.9 was actually, I believe the date on which that PIP was, excuse me, the performance review was completed was late October, October 23rd. So that was right around the same time as the first PIP ended, but before the November 1st near miss. That 1.9 resulted directly in the PMP, which as your honor has so eloquently stated better than I can do, had nothing to do with the discharge decision. Nothing. And the record is crystal clear about that. And one fact I must clear up that was reiterated, that was stated in the reply brief and has been reiterated today is that Poet Corporate in Sioux Falls somehow denied the termination request. That did not happen. It is true. They needed to approve it and they did. I'm running low on time. So I want to address one other point that council made and that relates to the comments by Becky Pitts about being removed from restrictions and your question your honor about how work comp light duty positions and restriction accommodations are related to this matter. First of all, very importantly, this is not a reasonable accommodation case that has been conceded. Second, this court has been careful to say and has said several times that when we look at the question of pretext, we are careful to distinguish from material facts and relevant evidence stray remarks, remarks by non-decision makers and remarks that are not related to the decisional process. Because we are here on an appeal from summary judgment, we are required to accept appellant's claim that he was asked by Becky Pitts when his restrictions would be lifted. Even so, however, your honors, it was these are statements as you pointed out that are not related to the decisional process. It is crystal clear. He was terminated because of the manner in which he operated the plant leading twice in a less than two month period after he had just been on a PIP for in part this very issue to the plant almost being lost. It was as a result of that and none of these bald assertions or side issues that have been raised that he was terminated. To that end, I will close by saying that his brief and reply brief are filled with with comments that they call evidence of animus. Comments such as the claim bald assertion that a fraud investigation was commenced by the plant manager over a work comp decision over a work comp claim. If you read the record, your honor, there was no fraud investigation commenced. So when Rick Shower is asked in his deposition are you surprised that a fraud investigation was commenced and he says yes, that is not evidence of animus. That is not evidence at all. The legitimate non-discriminatory reason for discharging this employee was based in bedrock. Their efforts to chisel away at it are not sufficient to create genuine issues of material fact. Thank you, your honors. Thank you, counsel. Ms. Polk, have some time. Thank you, your honor. I believe that our discussion here illustrates the fact that there are material issues of disputed fact with regard to the reason of the termination. We don't need to amuse bald assertions. You can put some hair on Mr. Cody's arguments by simply looking comparing the date of the PMP and the timeline given in his termination letter. You can see the termination letter which is found in the record at page 432 and 433 list is dated January 21st, 2009 and says current issue 12-25-08. The PMP is dated December 29th, 2008 after the 12-25 incident obviously and after there is a dispute about whether our reading of the record is Mr. Schauer said shortly after Christmas they decided to terminate Mr. Cody and they requested permission from HR and were told they had to do the PMP first and when you 29 PMP which was the date what was the date of 12-25? That was the current issue that they said was the reason for the termination in January 24th of 2009. We don't know what the PMP the people on that except for Schauer on the PMP? Yes. He was the person oh yes he was the decision maker at the time of the December 25th incident. He requested permission to terminate he was not only received the PMP but he was obligated as one of the people that was supposed to meet with and evaluate Mr. Cody's performance. It didn't happen and I can understand Your Honor that this is disputed facts and there are facts on both sides but at summary judgment when it's a close call and when there is evidence that suggests a lie which they admit that the PMP was and there's timing issues that make it a reasonable inference that Mr. Cody is correct it is up to the jury to make that ultimate decision and for that reason we request that this case be reversed and remanded to the district court with instructions to set it for trial. Thank you. Very good. The case has been very thoroughly briefed and argued and well argued. We'll take it under advisement.